A remarkable, meandering, 7-page opinion citing not a single circuit precedent, the District Court denied antitrust standing, and even injury in fact, to a direct competitor challenging the exclusionary practices of a dominant firm with undoubted market power. If the District Court had cited this court's doctor's hospital precedent, it might have recognized that antitrust standing was readily satisfied here for these classical antitrust claims by an allegedly excluded rival, and that it was conflating merits questions with antitrust standing, which is particularly problematic in this case because Pulse has been denied any meaningful merits discovery. In reality, a competitor alleging exclusionary practices by a monopolist in an industry where both the monopolist's market share and prices are increasing in the wake of congressional reform efforts designed to reduce their market share and to reduce prices is a case where Pulse's antitrust standing ought to be manifest. The weakness of the District Court's antitrust standing analysis is well illustrated by Pulse's challenge to the PAVD mandate as both an exclusionary practice under Section 2 and an unlawful tie under Section 1. The mandate unlawfully ties the debit signature products over which Visa has undoubted market power to pin debit products where it faces direct competition. As a competitor for supplying the tied product, the pin service, Pulse suffers an obvious antitrust injury and is the ideal player. Indeed, in all my searching for the first argument and before this one, I have not come across a single case where a rival supplier of a tied product was denied antitrust standing. In a tying case, it is the supplier in the tied product who is basically the perfect antitrust player. They have to prove their case on the merits, of course, but antitrust standing should not be a serious obstacle. The same basic logic applies here to the FANF pricing structure. FANF operates as a de facto tie by extracting large upfront payments from any merchant that accepts Visa credit or debit cards, and then it uses those, essentially those upfront payments that it extracts through its market power to then offer lower per transaction prices. But the net effect of this, to be clear, is that prices in the market have gone up. Prices for the debt service product have gone up because from the perspective of the merchants, their choice is essentially, I have to pay Visa a huge upfront fee because I can't afford not to accept Visa either for credit cards or debit signature cards, and then on top of that upfront payment, I still have to pay Visa per transaction fees for PIN transactions. And I just can't really afford then to go with somebody else who can't offer me the same kind of deal. Pulse can't compete directly on price in that market because we don't have market power. If Pulse tried to go to a merchant and say, here's the deal, you have to give us this huge upfront payment if you want to take even a single Pulse transaction, they would say, get out of here. We're not going to take one of your transactions then. Could you distinguish the, I think it's the Atlantic Richfield case about the predatory pricing on this point. It struck me that that may be an intention with your argument here, so help me with that. It's not intention with our pricing here because, for two reasons. First of all, just to be clear, if we were making a predatory pricing claim, which we're not, then our problem really wouldn't be with the antitrust standing, it would be on the merits. We'd have a problem on the merits. But the reason we're not making a predatory pricing claim is the first precondition for a predatory pricing claim, of course, is that the prices in the market have to be going down. And your claim has to be, oh, the prices are artificially low. That's not our claim. Prices in this market are going up. And the gravamen of our claim on the FANT structure has nothing to do with the ultimate per transaction charge, Visa charges, after it imposes the upfront fee. Our beef is really with the fact that they are tying the two together in a way that the market never did before. So my friends on the other side, my friend on the other side wants to say this is just like Atlantic Richfield or Cargill where we're complaining about the effects of competition. But it's exactly the opposite. We want direct competition on the merits in an apples-for-apples way for pin transactions. We'd love to have that. That's what we used to have before the FANT was imposed. And the FANT distorts that kind of apples-to-apples competition and artificially has led to increased prices because it leverages Visa's market power for credit cards and for debit signature cards. The same thing happens on the issuer side with the paved mandate. I mean, we'd be happy to compete head-to-head with Visa for placement on the back side of the card, if you will, which is essentially what the paved mandate gets to. Now, Visa says we want to be exclusive on the back side of the card. I mean, that's fair. That's the way we have competed in the past. But if Visa wanted to stop that just by offering the issuers a really good deal, really low transfer fees for the issuers, if you allow us to be on the back side of the card along with somebody else, because after the Durbin event, there has to be somebody else. If Visa wanted to do that on the merits, we'd be happy to try to compete with them. But they're not willing to leave it to competition. That's why paved is a mandate. It's not an opportunity to compete. It's a mandate. If you want to take our signature products, you have to put us on the back side of the card, one way or another. They also want to pass this off as being some great innovation. It's not an innovation. And one way you know that is one way that the issuer cannot use this paved process, which effectively is a way to use the signature side of the house for a PIN transaction. One way they can get out of that is if they use Visa's PIN product, Interlink, which preexisted all of this. So there's nothing particularly innovative about paved. There's certainly nothing particularly innovative about FAMF. Prices aren't innovative, I don't think. And particularly when what makes this a change from the market previously is that you've changed the pricing from a per transaction basis where it's very easy for somebody else to compete on the basis of price. And now you've effectively frustrated that because you're basically telling all of the merchant side consumers that you have to take our product. And in order to take our product, you have to give us this big upfront fee. All of that distorts competition. And all of that, I think, very clearly distinguishes Atlantic Richfield, Cargill, Brunswick. I think it's easiest to see in a sense with Cargill and Brunswick because in those cases, if you imagine what would happen if the antitrust plaintiff in those cases were successful. If they were successful in Cargill and Brunswick, the merger wouldn't happen. And based on their own antitrust theory, prices would go up and consumers would be worse off. If you accept for a minute that we're right about our antitrust theory here, which you're supposed to at this stage of the proceeding, if we win and we get the remedy that we're to get rid of the FAMP structure and to get rid of some of these volume discounts, I can talk about those in a minute, if we get the relief that we're seeking and we're right on our theory, then prices will go down. And so we're not somebody who's trying to essentially, is hurt by direct competition and is attempting to frustrate it in a way where the competitors' interests are kind of out of sync with the interests of competition. We're just seeking the opportunity to compete on the merits without these mandates that Visa is imposing artificially based on their market power in a different but related market. So explain to us, this is kind of to summarize I suppose, but explain to us step by step how or why it is that you say the prices will go down. The prices will go down? So I guess, let me try to do it with the various pieces of this. With respect to the FAMP piece of this, prices will go down pretty directly because at that point you'll have apples to apples competition for the PIN transactions and the merchants, if we succeeded, they'd be freed from this upfront payment. And so everybody would be able to compete on price the way they used to and that would definitely drive down prices for the PIN side of the transaction. The other thing of course is if there is robust competition for the PIN side of the transactions, that's going to have a deflating effect on the price for debit signature products. And one thing to understand about this market, I'm sure your honors do, but what Visa's really motivated here by is to protect the debit signature market where they have something like 70% market share. And you know there's something odd about this market because overall, pre-Durban amendment, post-Durban amendment, the prices for processing a transaction over the debit signature market have always been like $0.03 a transaction higher for the merchants and $0.02 a transaction higher for the issuers. So if you get more robust competition on the PIN side of the market and you really drive that price down such that you can get greater scale on that and more merchants will adopt the technology they need to to get PIN keyboards in their stores and things like that, that's going to really benefit consumers and merchants and ultimately issuers too because it's going to drive down not just the PIN price, but it's going to drive down the price for the Visa signature transactions. And that's why, you know, there's a reason here, and I want to get back and explain how this works on the PAVE side too, but it's a reason that the merchants are here as an amicus supporting us and that the retailers have filed an amicus brief in support of us because from their perspective, what has been caused by these exclusionary practices by Visa is the merchants' amicus brief estimates they're paying a billion dollars more than they would be without these mandates just on the merchant side. Now, on the issuer side, in some ways, it's almost easier to explain because what the PAVE mandate prevents is it prevents my client from going to an issuer and saying, look, if you will put us as the only PIN provider on the back side of the card, I will guarantee you, the issuer, that you will have very, very low fees that we will charge you per transaction. Now, if we do that, we will be the exclusive provider on the PIN transaction, and we may increase what we charge the merchants on that, but we're still going to be way below what Visa's charging on the signature side. So, I think we're still going to have a deflationary pressure on the merchant side, but we're going to have an obvious, direct deflationary price pressure on the issuer side of the market. And in a way, to me, that's very easy to understand because from the issuer, if they're trying to maximize their revenues, what they would like to do is they would like to get a Visa card because, you know, you really can only get a Visa debit card or a Mastercard debit card, and, you know, Visa's the dominant one, so they want that. But then on the back side, if somebody will come to them and say, I'll get your issuer fees as low as, you know, as we can get here for the issuer, the transfer fees, they want that. And what has been shown in the market before this paid mandate was introduced is the way competition works in this market is somebody like Pulse comes in and they say, like, you know, I'll do these transactions for you for one cent instead of three cents, what you were previously being charged for each one of these transfers. And maybe Star comes in and says, oh, we can do it for .9 cents, but what's the valuable opportunity for somebody who's trying to compete with Visa is that exclusive payment. And what the mandate does is it just wipes that out, and it does it by a mandate that is directly done by Visa's market power in the Visa signature market. There's nothing subtle about this. There's nothing competitive about it. I mean, if we get rid of the paid mandate, it doesn't mean that Visa will never be on the back side of the card. It just means that they'll have to fight to get there with prices and lowering prices and won't just be able to do it by fiat. And it's, you know, it's a fiat that, you know, God didn't give them the fiat. What gave them the fiat is their market power and the debit signature side of the market. And so I think if you, this is a long way, I think, of explaining why the prices would go down. The part of this that maybe is the least obvious intuitive about prices going down, but I still think works in the end, is our concerns about the volume price discounts and other discounts that are tied to exclusively using the Visa signature product. Because the way I think to think about those is, first, they are sort of related to the FAM, because, you know, in some respects, what allows Visa to give those volume discounts is they get a big chunk of money up front. And that allows them to say, but if you do almost all of your transactions with us, we'll shave that down a little bit. But what's really pernicious about those volume discounts and related practices is that I think, you know, the economists seem to agree that what you need to get a really viable alternative to Visa signature for some of the so-called pinless transactions, and the best example of those might be transactions on the internet, where nobody's in person to sign it or to type in numbers on a keypad. So both sides, there's some efforts to try to basically get a technology that would allow the traditional pin providers to compete, essentially like having a signature product for those transactions. But in order to make that work, you have to have a certain volume. Because if you can't get above, you know, 4 or 5 percent, nobody's going to do the investment necessary to make that product work. So if you're Visa and you're sitting there trying to protect your Visa signature market, what you'd like to do is to keep all of your competitors below that certain threshold. And the volume discounts are perfectly designed to do that, because they basically say, look, you've got to do 85 percent of your business with us to get the discount, or 90 percent of your business with us to get the discount. And that is all designed to keep the market share of people like Pulse artificially low so that it protects the Visa signature market monopoly. Where do you think Professor Epstein goes off the rails? I think Professor Epstein goes off the rails by not fully appreciating the two-sided nature of this market. And, you know, the other thing is, you know, and God bless Professor Epstein, but I don't think he likes some of the precedents that are on the books in this area. So I think, you know, for him, as an academic matter, he may think that, you know, rivals should never be able to bring suits against exclusionary practices. But that's not the law. That's never been the law. It's certainly not the law that, you know, as Professor Arita and his subsequent editors have summarized the law in their treatise. And so I think that's effectively where he goes off the rails here. I would say that, you know, I do think in understanding the antitrust standing issue, you know, not every practice that's being challenged is the same. And I think, you know, some of these cases that my friends on the other side rely on, like Cargill and Brunswick, are in the merger context. And in the merger context, I think courts are absolutely right to be skeptical if it's a rival that's trying to stop a merger. Because from the standpoint of the antitrust law, the reason we're concerned about the merger is it's going to concentrate the market and allow suppliers in the market that's being merged to raise their prices. And so logically, a rival should benefit from that. And if the rival is there challenging that, there's a fundamental disconnect. And you can probably tease out, as those cases do, that ultimately what the rival is concerned about is the prices are going to go down in some way because of the efficiencies from the merger. But when you're challenging a Section 2 exclusionary practice of a monopolist or you're challenging a Section 1 tie, in those kind of cases, it's a very different dynamic and the rivals are the right people to be bringing the challenges. Now, consumers might also be able to bring some cases. Although my friends on the other side sometimes suggest we just can't be here because the merchants are injured and they can bring their claim or the issuers are injured and they can bring the claim. It's just not the law that when it comes to these kind of exclusionary practices that only consumers can bring the challenges and rivals can't. And I would submit to you, when you start focusing on the right kind of analogous claims, which are exclusionary practices under Section 2 and illegal ties under Section 1, where the rival is in the tied product market, in those kind of situations, the rival is exactly the person who should be bringing these challenges. And you see that in the retailers' amicus brief because what they point out, I think, has been true in this market in particular, the rivals are the ones that have the most interest in structural reform. I mean, ultimately, you know, the merchants, their injury is they pay too much. They're seeking travel damages. Somewhere down the road, it'll probably settle in some kind of class action litigation. They'll get money, but there won't be the same kind of meaning. You know, in some of those cases, there may be some structural reform, but the incentives are more about the money in those cases. But from a rival's perspective, you really are fighting. I mean, you know, we do have a damages claim, I don't want to suggest, for lost profits, which is a different injury from the anti-competitive scheme than what the merchants overpay. But we really do seek structural reform here because ultimately, for this to work for us, we just have to be able to compete. And we want to be able to compete on an apples-to-apples basis. Maybe we'll win, maybe we'll lose, but that's what we're seeking to get rid of, these anti-competitive distortions of competition when Visa's power in one market is being projected into the other parts of the market where they face competition. And so, you know, I hope that's responsive, but I do think that, you know, it's a mistake to sort of jump from the merger cases to the exclusionary practices cases. If I could say one more thing about Atlantic Ridgefield, I think that's another particularly great example of where antitrust injury is the right way to think about the problem there. Because if you really, you know, go back into sort of the pre-Albrecht world, where we were concerned about vertical maximum price arrangements as being a per se violation, obviously the Supreme Court eventually decided maybe they didn't get that right, maybe they shouldn't have been as concerned. But the concern with a maximum price fixing scheme was that two groups of people were going to be hurt. One was the company's own retailers, because by having a maximum price, the idea was they couldn't compete with their rivals in the retail market by providing extra services that people really wanted and were willing to pay for. So that's one group that was hurt. The other group that was hurt was consumers, because consumers might lose some of those same services that they want. But the theory, if you accept the theory of the vertical price maximum price maintenance problem, the rivals are absolutely the wrong person to be bringing any kind of lawsuit in that situation, because the antitrust theory is that they actually benefit artificially. And ARCO's own retailers are the ones that are hurt. So if you sort of follow through the logic of the antitrust violation in ARCO, the plaintiffs in ARCO, the competing retailers, they should have been laughed out of court and instructed to give a thank you note to the ARCO parent for engaging in something that hurt their retailers and consumers to the benefit of the rivals. So there's a complete mismatch, and I think you can understand Cargill and Brunswick in that same kind of complete mismatch way, and that's not what this is. You can quibble about whether we're ultimately going to succeed on the merits, but there's no mismatch. We're the right person. If Pulse is complaining about being excluded from this market and not being able to engage in apples-to-apples competition, it's just hard to imagine who's a better antitrust plaintiff for that than Pulse, and they certainly suffer an antitrust injury if you assume they have a valid claim. With regard to your argument urging reassignment to a different district judge, anything beyond your briefing you want to add on that point? I think what I'd like to say on this is just first to emphasize what an odd posture we are in here, which is we have had effectively no party discovery on Visa whatsoever, and if you're looking for sort of a good summary of the impact of things we'd like to get that we haven't, on page 24 of our opening brief we kind of go through some of the stuff that we would like. But one way that sort of struck me as I was preparing for this argument is we haven't gotten a Rule 30b-6 deposition of Visa. I mean, so we've just been completely stopped in our tracks in an antitrust case from doing any discovery on the defendant. Now, and we're four years plus, I mean, we're four years when we filed our appeal, so we're five and a half years into this case. Now, that seems to me to be powerfully consistent with a judge who just doesn't take antitrust cases or antitrust plaintiffs very seriously, and isn't really willing to roll up his sleeves to do the hard work to sort of figure out how this market works, and particularly given that it's a two-sided market, particularly given that I think this is going to be the first decision in this circuit that's going to really wrestle with two-sided markets after American Express, which is a difficult and I think important area of the law. I think all of the various factors that support reassignment would be satisfied in this case. And, of course, just these basic facts about how long we've languished the complete lack of discovery are, of course, buttressed by some of the on-the-record comments that the judges made, calling into question landmark antitrust cases, antitrust plaintiffs. And it's fine if an academic wants to say that the Supreme Court took a wrong turn in IBM and Standard Oil 112 years ago or whatever. I mean, that's great for an academic, but for a judge who's supposed to impartially adjudicate a case, to say that on the record seems to me to be much more problematic. And part of the reason I emphasize where we are in discovery is that usually a reassignment at this stage of a case would require a lot of duplication of effort and would be inefficient from that standpoint. But that's not really the case here. We're still kind of stuck in the starting gate in terms of meaningful discovery in this case. And so I think reassignment would have a lot of efficiencies and allow us to get across the finish line much more quickly. And I think it's, you know, I will say this is not a request that we make lightly. You know, we do think this is a rather extraordinary case that justifies serious consideration of that as remedy, which is why we've asked for it. I think, you know, if we do go back to the district court, I think it's hard to see anything in this case that suggests that we're going to get robust discovery and then get on to the merits. And I think it's particularly problematic here, not just because, you know, this is a case where it's a two-sided market and complex. This is also a market where, you know, technology is moving on and, you know, to understand whether or not what Visa's already done is anti-competitive and problematic I think would be very useful to all the participants in this market. The last thing I'll say about this... As you probably know, or maybe you don't, but we get more requests for reassignment for this particular judge than any other judge in the circuit, maybe more than for all the other judges in the circuit combined. I'm not surprised to learn that. I mean, just from the reported opinions, they would seem consistent with that reality. I just finished with this quick thought, which is, you know, part of the problems here are manifested from increased market share by the dominant firm, increased prices, but they're also very clearly manifest by the fact that the United States, unlike many other countries, is using a technology that is more expensive and is less efficient from the standpoint of avoiding fraud and safety and all of that. So there really are signs that this is a market that deserves a very serious reconsideration. Thank you, Your Honors. Thank you, Mr. Clement. And you've saved time for your vote. Ms. Hill? Thank you, Your Honors. May it please the Court. This case underscores why the antitrust injury requirement is so crucial. Allowing this suit to go forward would not only eviscerate the antitrust injury requirement, but also undermine the fundamental goals of antitrust law, because Pulse's claimed injuries are textbook injuries from competition in two ways. First, PIN-authenticated visa debit, or PAVD, ensures merchants have a choice in transactions and, in Pulse's own words, quote, will cause Pulse to have to compete for every transaction. That's ROA 3554 and 3557. Having to compete is the opposite of antitrust injury. Second, visa vigorously competes through fixed acquirer network fees, or FAMF, and discount agreements to win those transactions, leading Pulse to lower its own per-transaction fees. Antitrust law welcomes that result outside predatory pricing, and there's no allegation of that here, as my friend just confirmed in his argument. To your point, Judge Duncan, about Atlantic Richfield, even today, Pulse refuses to acknowledge the Supreme Court's instruction in Atlantic Richfield, worth quoting in full, that antitrust violations may have three effects, often interwoven. In some respects, the conduct may reduce competition, in other respects, it may increase competition, and in still other respects, it may be neutral as to competition. That's 495 U.S. at 343-44. To avoid chilling pro-competitive conduct, the court went on, an antitrust plaintiff, quote, can recover only if its law stems from a competition-reducing aspect or effect of the defendant's behavior, close quote. And that holding dooms Pulse's case, because all of Pulse's asserted injuries flow from competition-increasing aspects of the challenged conduct. So how does the fixed network fee increase competition? Sure, and focusing first and foremost, Judge Schmidt, the part of FAMF that allegedly violates the antitrust law is the fixed fee. But Pulse doesn't pay that fee and has actually used it to start charging its own fixed fee. That's at 4862 of the record. Pulse looks at FAMF as a fixed fee, which Pulse says is too high, which supports a per-transaction fee, which Pulse says is too low. But Pulse lacks standing to challenge either the high in Pulse's allegation fixed fee because competitors like Pulse benefit from the higher prices because they can price under them like an umbrella, or the low transaction fee on the merchant's side because antitrust law encourages low prices unless they're predatory again, which Pulse doesn't claim here. And a total price analysis doesn't change that. If Pulse thinks the total price under FAMF is too high, it lacks antitrust standing because it doesn't pay either the fixed fee or the per-transaction fee. And if Pulse thinks the total price is too low, it lacks standing because the total price isn't predatory either. As Pulse's own economist said, and it's at 4995 of the record, FAMF supposedly injures Pulse by causing it to actually lower its per-transaction fees to compete. But Atlantic Ridgefield held at 340 that low prices benefit consumers regardless of how they are set. And it's undisputed that Pulse could profitably compete with Visa's lower per- transaction fee, and that's at 1757 of the record. To use its own hypo in its reply brief, Pulse may not like charging $4 a transaction when it used to charge $10, but antitrust law doesn't care. Lower prices are what antitrust law encourages after all. And just to note, I think I heard my friend talk about merchant fees and lowering merchant fees. The record reflects that pre-Durbin Amendment, Pulse actually increased its network fees, and in 2011 on the day that the Durbin Amendment passed, Pulse raised its transaction fees on the merchant side. Pulse's whole plan to compete under the Durbin Amendment was to offer issuers exclusive deals and then increase and make merchant per-transaction fees. No question, Visa's post-Durbin strategies of PAVE and FAMF disrupted Pulse's plan or their business strategy, right? But the antitrust laws, if there's one truism in antitrust law, it is that antitrust law does not protect competitors but competition. And not in the briefs, not in the supplemental briefing, not in the first argument, and respectfully not today, has Pulse articulated under Atlantic Richfield, as the Supreme Court's cases and as this Court's cases require, how a competition-reducing aspect of PAVE, FAMF, or the discount agreements has injured it in a way that antitrust law cares about. And to go back to PAVE, the part of PAVE that allegedly violates antitrust law is the requirement that issuers enable PIN authentication over Visa's signature network. But adding that capability doesn't foreclose any part of the market, however defined, to Pulse. What do you do about the cited deposition of an officer of Kroger who stated that Visa fined Kroger repeatedly for using competing PIN debit networks instead of Visa's signature debit network and threatened to revoke Kroger's ability to accept any Visa debit card? What are we to make of that? Well, I think, Your Honor, that goes to the mismatch between Pulse's theory of antitrust violation and Pulse's articulation of its own injury from a competition reducing aspect of that. Kroger, of course, is a merchant. As my friend pointed out, there is currently that case that Your Honor brings up with Kroger, I believe, settled. There is ongoing litigation. That only underscores that there is no reason in this case to bend or dilute antitrust standing or antitrust injury to accommodate the claims here. Again, in our view, that just underscores Judge Smith the mismatch between the violations which are assumed, the district court assumed them, we assumed them, there's no issue there, for purposes of the standing analysis and the lack of an articulation by Pulse of how it is injured from a competition reducing aspect of the alleged violation, which is the question before this court. And I heard my friend say that Pulse is harmed because it can't offer deals to issuers in exchange for exclusivity. But that's not what the record shows about Pulse's harm. PAID requires Pulse to compete on the same volume. That's 3554 and 3557. Those are Pulse documents. At 4995, there's the testimony of Pultism economist, Dr. Hausman. That is not antitrust injury. It's the opposite. And Pulse cites no case that losing exclusivity is antitrust injury. And for good reason, because Brunswick holds exactly the opposite. Let me move on and talk a little bit about the volume discount agreements that my friend raised. Pulse still has not articulated a theory about how those agreements violate the antitrust laws. And without a theory, it's impossible to tell whether Pulse was harmed by a competition reducing aspect of any alleged violation. So take lower prices, for example. If the theory is vertical maximum price fixing, there's no antitrust injury. If the theory is predatory pricing, which we know is not at issue here, there would be. And that's why the Supreme Court said in Associated Contractors that courts can't assume a defendant has violated the antitrust laws in ways that haven't been alleged. If it's because Visa used FAM to fund the discount agreements, and that was what Pulse argued below, Pulse lacks antitrust standing because the agreements are just another form of lower prices which antitrust law welcomes, which is why such agreements generally outside of the predatory price context, which we don't have here, raise no problems in antitrust law whatsoever. I heard my district court to task for not citing Doctors Hospital, this court's precedent. Of course, the district court did cite the Supreme Court's key cases on this, Brunswick, Cargill, and Atlantic Ridgeville. As to Doctors Hospital, that case actually requires affirmance here for two reasons. First, it involved a wholesale exclusion from the market, and that is very different from what we have here, where the law requires that Pulse can compete for a spot on every Visa-branded debit card. PAVE does not change that one iota. If anything, the Durbin Amendment shows why Pulse doesn't have a claim that exclusion is an injury here. And number two, the doing the rival's complete exclusion from the market would increase competition and lower prices. That's why Doctors Hospital is such a paradigmatic case of antitrust injury. Wholesale exclusion from the market, and when you look at the remedy, the remedy increases competition and lowers prices. Here, the exact opposite is true. Eliminating PAVE and FAMP as Pulse requests would reduce competition and increase fees, because PAVE causes Pulse to compete for routing on every PIN transaction, and FAMP causes Pulse to lower its per-transaction fees. Unless there are any further questions, I'll conclude and just wrap up. Pulse can try to dress it up however it wants, but at the end of the day, its real complaint is that it was injured by having to compete for every transaction with lower per-transaction fees, and that's a result antitrust law welcomes. That's why enforcing the antitrust injury requirement, particularly in cases involving rivals, is so crucial. It prevents rivals like Pulse from weaponizing antitrust law and the threat of trouble damages to deter innovative pro-competitive strategies. I thought it interesting that my friend said that what they want is structural reform, which I think is a euphemistic way of saying what they want is to get rid of strategies and practices that require them to compete. The so-called remedies Pulse seeks, eliminating PAVE, eliminating FAMP, eliminating discounting agreements, would harm competition, which is why Pulse lacks antitrust standing, and the judgment should be affirmed. Thank you, Ms. Howard. Thank you, Your Honors. Mr. Clement, you save some time for rebuttal. Thank you, Your Honors. Just a few points in rebuttal. First of all, my friend's very first words out of her mouth were that the PAVE mandate ensures that merchants have a choice. But there's two problems with that argument. First, it's a choice that the merchants themselves don't want. They don't want to have everywhere they look, on the signature side of the market and the VISA everywhere. That's not what they want because they know that's not in their interest because they know what's ultimately going to drive down prices in the whole debit market is to have robust competition between a PIN option and the VISA signature monopoly. So having VISA there on the PIN side of the card is not something that the merchants want. So they're giving them a choice the merchants don't want. And the only way they're getting that is by giving the issuers no choice at all. The PAVE is a mandate. We call it a mandate for a reason. The issuers have no choice but to put VISA on the back side of the card. Now, my friend says, well, there's something weird here because what we're complaining about is losing a right to be exclusive. Well, we're losing a right to be exclusive on the back side of the card but that doesn't mean we're getting some exclusive position in the market. We still have to compete with VISA and its signature debt card product, which is the dominant market product for every transaction. So what we are looking for here is an opportunity and what PAVE gets at is we're trying to compete in the way that you compete in this market. The only way you compete in the market and the way people competed before the Durbin Amendment as a PIN provider was to get that exclusive placement. Because if you don't have the exclusive payment on the back side of the card, you have no opportunity to essentially meaningfully compete with VISA on the front side of the card. And so when a monopolist targets the way that non-monopolists have competed with them and they target that means of competition and eliminate it directly with a mandate that is enforced by their monopoly power on the signature side of the market, that is both a pretty obvious antitrust violation but certainly something that the rival that has now lost their only means of competition, the way they've traditionally competed, they certainly have antitrust injury, which is really the issue at this stage of the case. My friend also says that VISA vigorously competes via the FAMP. But the FAMP is inherently anti-competitive. It ties together three markets, the credit card market, the debit signature market, and the debit PIN market, and basically says that in order to take any VISA product you have to make a huge upfront payment and then it links it to the rest. Our real concern here is not with the exact level of the back-end discounts. Our concerns are twofold. One is the fact that they've linked it together and we can't break through that because even if we cut lower prices we can't offer them the kind of monopoly services that the VISA has in credit card and in the debit card. I think your own experience will tell you they can live without Pulse, they can live without the Star Network, they can't live without VISA. So by tying a market where VISA has honest-to-goodness monopoly power and merchants can't live without them and tying the pricing of that to the PIN transaction they have distorted competition very directly. You can sort of understand this. They could just as easily come in and say, look, if you want to do any transaction with us, it's $1,000 upfront and after that every other transaction is free. Nobody can compete with that because the merchants need that VISA transaction and this is just sort of a variation on this theme and we can test if we get back, ideally in front of a different judge, they'll have an opportunity to explain why this is really pro-competitive but we certainly should have standing to challenge that because we think it's destroying our ability to compete. Just a couple quick last points. Doctors Hospital did not involve a total exclusion from the market. It involved total exclusion from a particular PPO but the market was hospital services and one side or the other of Jefferson Parish and Doctors Hospital continued to participate in that market. So they were excluded from a means of competition entirely but they weren't excluded from the market. So Doctors Hospital is directly on point. My friend says that we are concerned about lower prices or we're complaining that we have to lower prices in this market if you look at only half of fans. Everybody besides VISA in this market, including the merchants will tell you prices are going up, not going down. The second thing is they say there's greater choice. There's only greater choice by giving the merchants a choice they don't want, by giving the issuers no choice at all. And the last thing I'll say is that if we were complaining about competition here and trying to save ourselves from robust competition, we wouldn't be assailing mandates that VISA is imposing. They're the antithesis of robust competition on the merits. Thank you, Your Honors. Thank you, Mr. McMahon. Your case and both of this afternoon's cases are under submission and the Court is in recess under the usual order.